# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Civil No. 3:13-cr-00162 |
| | ) | Judge Aleta A. Trauger |
| WENDY ASKINS | ) | |

## MEMORANDUM

This matter comes before the court on a Motion to Dismiss Indictment and Disqualify Counsel filed by the defendant, Wendy Askins (Docket No. 150), to which the United States has filed a Response (Docket No. 156). For the reasons discussed herein, the motion will be denied.

## BACKGROUND[1]

Askins is a former executive director of the Upper Cumberland Development District ("UCDD"), a quasi-governmental entity established by the State of Tennessee to further the economic development of the state's Upper Cumberland region. (Docket No. 131 ¶¶ 1, 4.) UCDD is governed by a board of directors and an executive committee, but its day-to-day operations are managed by the executive director. UCDD oversees the administration of the Cumberland Regional Development Corporation ("CRDC"), which is primarily focused on creating affordable housing, and the Cumberland Area Investment Corporation ("CAIC"), which administers an at least partially federally funded program offering loans to small businesses. (*Id.*

---

[1] In addition to the federal charges pending in this court, Askins is currently facing state charges in the Criminal Court for Putnam County, Tennessee. Askins filed a motion to dismiss her indictment in Putnam County, raising essentially the same arguments she raises here. (Docket No. 156-1.) That court held an evidentiary hearing on the motion and heard testimony from several witnesses, including Askins, before denying the motion. (Docket No. 156-2.) The government has provided excerpts from that hearing. (Docket No. 156-3.) The facts in this section come variously from the state court hearing, other materials the parties have produced relevant to this motion, and Askins' indictments.

1

at ¶¶ 1–3.)

In 2007, UCDD retained the Rader Law Firm to provide periodic legal assistance to UCDD as needed. (Docket No. 156-3, pp. 24, 168.) Throughout the relationship, the firm's services were paid for by UCDD with its discretionary funds. (*Id.* at pp. 53–55.) As executive director, Askins served as UCDD's primary contact with the Rader Law Firm, although the firm's senior partner, Daniel H. Rader, III ("Dan Rader"), has testified that, at times, he communicated with several other individuals at UCDD as well. (*Id.* at p. 193.) Askins has testified that, prior to 2011, UCDD called on the Rader Law Firm rarely, at a rate that she estimated as no more than twice per year. (*Id.* at p. 24.) In summer of 2011, Askins and UCDD deputy director Larry Webb met twice with Dan Rader to discuss the management of an allegedly UCDD-funded property known as the "Living the Dream" project, located at 1125 Deer Creek in Cookeville, Tennessee. (*Id.* at p. 26; Docket No. 131 ¶ 9(b), (j)–(m).) Askins and Webb were interested in forming a company to provide services to residents of the Living the Dream project, but Rader advised them that such steps would create a conflict of interest in light of their professional positions with UCDD. (Docket No. 156-3, pp. 59, 182–83.)

In the fall of 2011, UCDD received a number of requests from media outlets under Tennessee's Open Records Act and sought the assistance of the Rader Law Firm in responding to the requests. (*Id.* at pp. 59–61.) In the course of its review, the Rader Law Firm discovered irregularities in UCDD's records that prompted Dan Rader to call Askins and request that she set up a meeting with Mike Foster, the chairman of the UCDD board of directors. (*Id.* at pp. 134–39.) Dan Rader has testified that he told Askins that she was "welcome to" attend the meeting as well. (*Id.* at p. 186.) The resulting meeting was held on January 12, 2012, and was attended by the following people: Askins; Foster; the vice chairman of the UCDD board of directors, John

2

Pelham; Dan Rader; and Rader's son, another member of the firm, Daniel H. Rader, IV ("Danny Rader"). (*Id.* at pp. 64–65.) At the meeting, the Raders distributed a letter from Danny Rader addressed to Askins and Foster under their formal UCDD titles and at their UCDD work addresses. The letter detailed the scope of what had so far been requested by the media and produced by UCDD, and noted, in particular, issues related to the minutes of a February 16, 2010, board meeting. (Docket No. 150-2.) Throughout, the letter used the word "you" without clearly identifying whether it was referring to one of the recipients, both of the recipients, or UCDD itself. (*Id.*)

The January 12, 2012, meeting was electronically recorded and has been transcribed. (Docket No. 150-1.) Among the topics discussed in the meeting were the possibility that documents had been falsified or destroyed, the possibility that an audit might reveal embezzlement by Askins, and the possibility of an eventual criminal investigation. (*Id.* at pp. 15, 18, 34–35, 38.) The transcript shows that: early in the meeting, Dan Rader stated that he had "been the lawyer for UCDD for a couple of years"; he later said, "[W]e represent the UCDD and we feel like we have an obligation to have you guys here to try to protect UCDD and its reputation"; and he later reiterated, "I want to protect UCDD, and that's who we represent, UCDD." (*Id.* at pp. 3, 18–19, 38) Shortly thereafter, Dan Rader said to Askins that, in light of some of the facts the Rader Law Firm had uncovered so far and the media's persistence in the matter, he thought Askins "need[ed] to probably consult a personal attorney." (*Id.* at p. 42.) Before the conversation ended, Dan Rader mentioned a final time that he was not Askins' criminal defense attorney. (*Id.* at p. 56.) Askins has testified that, until Dan Rader mentioned her need to get her own attorney, she believed that he represented her as well as UCDD. (Docket No. 156-3, pp. 67–68.)

3

In the spring of 2013, Dan Rader was contacted by the FBI about his dealings with Askins and the UCDD. (*Id.* at 190.) Dan Rader discussed the matter over the phone with Mark Farley, who had by that time succeeded Askins as executive director of UCDD. Dan Rader confirmed with Farley that UCDD wished to waive its attorney-client privilege in the matter. (*Id.*) Dan Rader went on to speak with the FBI in May of 2013, and again in early 2016. (*Id.*) Danny Rader met with a TBI special agent and an investigator with the Tennessee Attorney General's Office in August of 2013. (Docket No. 150-4.) Over the course of the interviews, both Dan and Danny Rader conveyed information they had received from Askins in the January 12, 2012, meeting.

On September 25, 2013, a federal grand jury charged Askins with one count of conspiracy to commit an offense against or defraud the United States, six counts of theft of public money, four counts of bank fraud, three counts of money laundering, and two counts of making false statements in a matter under federal jurisdiction. (Docket No. 1.) The grand jury returned a superseding indictment on February 24, 2016, charging Askins with one count of conspiracy to commit an offense against or defraud the United States, two counts of embezzlement from a program receiving government funds, one count of theft of government property, four counts of bank fraud, and four counts of money laundering. (Docket No. 131.) Many, if not all, of the charges Askins faces touch in some way on documents, actions, or transactions discussed in the January 12, 2012, meeting with the Rader Law Firm attorneys. (*Id.*) On July 27, 2016, Askins filed an *in camera* motion asking the court to dismiss the indictments in light of the Government's reliance on communications between Askins and the Rader Law Firm, which Askins asserts were protected by attorney-client privilege. (Docket No. 150.)

**LEGAL STANDARD**

Motions to dismiss indictments are governed by Rule 12 of the Federal Rules of Criminal Procedure, which states that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b). The Sixth Circuit guides district courts to "dispose of all motions before trial if they are capable of determination without trial of the general issue." *United States v. Jones*, 542 F.2d 661, 665 (6th Cir. 1976). A defense raised in a motion to dismiss indictment is "capable of determination if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *Id.* at 664 (citing *United States v. Covington*, 395 U.S. 57, 60 (1969)). On a motion to dismiss indictment, "the [c]ourt must view the [i]ndictment's factual allegations as true, and must determine only whether the [i]ndictment is 'valid on its face.'" *United States v. Campbell*, No. 02-80863, 2006 WL 897436, at *2 (E.D. Mich. Apr. 6, 2006) (citing *Costello v. United States*, 350 U.S. 359, 363 (1956)). Accordingly, the court must resolve factual issues in this case, such as they exist, in favor of the allegations in the indictment. With this standard in mind, the court turns to an analysis of the defendant's motion.

**ANALYSIS**

Askins contends that, at the time of the January 12, 2012, meeting, she enjoyed an attorney-client relationship with the Rader Law Firm, and she reasonably and correctly believed that her statements in the meeting were covered by attorney-client privilege. She argues that she never consented to the firm's decision to break the privilege and that the information that the Raders provided to investigators has so tainted the proceedings in this matter that the only appropriate remedy is dismissal of the indictment. Alternately, she challenges the adequacy of UCDD's waiver of its attorney-client privilege in the same communications. The government

counters that the Rader Law Firm never represented Askins in her personal capacity, that its only relevant attorney-client relationship was with UCDD, and that UCDD validly waived the relevant attorney-client privilege through Farley, its executive director.

"The attorney-client privilege protects from disclosure 'confidential communications between a lawyer and his client in matters that relate to the legal interests of society and the client.'" *Ross v. City of Memphis*, 423 F.3d 596, 600 (6th Cir. 2005) (quoting *In re Grand Jury Subpoena (United States v. Doe)*, 886 F.2d 135, 137 (6th Cir. 1989)). The Sixth Circuit has described the elements of attorney-client privilege as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser (8) except the protection be waived.

*Humphreys, Hutcheson & Moseley v. Donovan*, 755 F.2d 1211, 1219 (6th Cir. 1985) (quoting *United States v. Goldfarb*, 328 F.2d 280, 281 (6th Cir.), *cert. denied*, 377 U.S. 976 (1964)). "The privilege's primary purpose is to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'" *Ross*, 423 F.3d at 600 (quoting *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998)). Attorney-client privilege "applies only where necessary to achieve its purpose and protects only those communications necessary to obtain legal advice." *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 294 (6th Cir. 2002) (quoting *In re Antitrust Grand Jury*, 805 F.2d 155, 162 (6th Cir. 1986)). "The attorney-client privilege is 'narrowly construed because it reduces the amount of information discoverable during the course of a lawsuit.'" *Ross*, 423 F.3d at 600 (quoting *United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997)).

"The client, not the attorney, is the holder" of the rights attendant to attorney-client privilege. *Fausek v. White*, 965 F.2d 126, 132 (6th Cir. 1992). Because the client owns the rights, the client may also waive them. *See Cooper v. United States*, 5 F.2d 824, 825 (6th Cir. 1925) ("The rule which forbids an attorney from divulging matters communicated to him by his client in the course of professional employment is for the benefit of the client. But it may be waived by the client . . . ."). Askins and the government agree that UCDD and the Rader Law Firm enjoyed an attorney-client relationship capable of giving rise to attorney-client privilege. (Docket No. 151, p. 11; Docket No. 156, p. 9.) Askins, however, argues that the firm also represented her in her personal capacity, and that any waiver of attorney-client privilege was therefore incomplete unless both she and UCDD consented. (Docket No. 151, p. 11.) *See Anderson v. Clarksville Montgomery Cty. Sch. Bd. & Sch. Dist.*, 229 F.R.D. 546, 548 (M.D. Tenn. 2005) (noting that, in case where single attorney represented multiple clients, "it appears appropriate to maintain the attorney-client privilege absent a waiver by all plaintiffs").

The Sixth Circuit has recognized that, when an attorney for an entity communicates with the entity's employees, "[t]he default assumption is that the attorney only represents the corporate entity, not the individuals within the corporate sphere . . . ." *Ross*, 423 F.3d at 605 (quoting *In re Grand Jury Subpoena*, 274 F.3d 563, 571 (1st Cir. 2001)). That assumption, however, can be overcome in certain cases if the employee demonstrates, as a threshold matter, that he clearly "indicate[d] to the lawyer that he [sought] advice in his individual capacity." *Id.* (citing *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999)).

Askins relies on the following in support of her claim that the Rader Law Firm represented her in her personal capacity: her contemporaneous belief that the firm represented her; the lack of a clearer warning from UCDD's attorneys that they did not represent her; the

7

ambiguous use of "you" in Danny Rader's letter from the day of the meeting; the fact that she was a "high managerial agent" whose activities might give rise to criminal liability for UDCC under Tenn. Code Ann. § 39-11-404(a)(2); and her two prior meetings with Dan Rader in which they had discussed her potential conflict of interest related to Living the Dream. All of the factors Askins has identified, however, are either inapposite to the test adopted by the Sixth Circuit or inadequate to the purpose for which she has presented them.

The Sixth Circuit does not direct a court considering a claim of personal privilege with corporate counsel to weigh the general equities of the situation. Rather, the court must determine whether the communications between the officer or employee claiming privilege and the relevant attorney or attorneys affirmatively establish the formation of a personal attorney-client relationship that is distinct from the preexisting attorney-client relationship between the attorney and the corporate entity. *See Ross*, 423 F.3d at 605 ("Our court, like many others, requires that the individual officer seeking a personal privilege 'clearly claim[]' he is seeking legal advice in his individual capacity." (quoting *In re Grand Jury Proceedings, Detroit, Michigan, August 1977*, 570 F.2d 562, 563 (6th Cir.1978)).

The only communications on which Askins can base her argument that she sought to form a personal attorney-client relationship with the Rader Law Firm are her 2011 meetings about her potential conflict of interest regarding Living the Dream and the January 12, 2012, meeting itself. Nothing about the 2011 meetings, however, suggests that they amounted to a departure from the firm's ordinary role as counsel to UCDD. The advisability of UCDD's executive director starting a private business that would give rise to a conflict of interest with her UCDD duties is well within the range of topics appropriate for UCDD's counsel to opine upon. Askins' 2011 meetings with Dan Rader were, therefore, insufficient to establish a newfound

relationship of personal representation. The transcript of the January 12, 2012, similarly reveals no evidence of a personal attorney-client relationship. Whatever Askins' subjective belief going into the meeting, the meeting itself was plainly conducted as a discussion between UCDD's counsel and relevant personnel about UCDD's obligations and predicament.[2] Accordingly, the attorney-client privilege in this case remained UCDD's to waive.

Moreover, even if Askins had established an attorney-client relationship with the Rader Law Firm, her communications during the January 12, 2012, meeting would not be entitled to attorney-client privilege, because they were not made in confidence. "The essence of the privilege is confidentiality, and when confidentiality is destroyed, there is little justification for incurring the heavy cost to the production of relevant evidence which the privilege exacts." *360 Const. Co., Inc. v. Atsalis Bros. Painting Co.*, 280 F.R.D. 347, 351 (E.D. Mich. April 12, 2012). Because attorney-client privilege applies only to confidential communications, it "will not shield from disclosure statements made by a client to his or her attorney in the presence of a third party." *Reed v. Baxter*, 134 F.3d 351, 357 (6th Cir. 1998) (citing 8 John Henry Wigmore, Wigmore on Evidence § 2311 (3d ed.1940)). The January 12, 2012, meeting was not attended only by Askins and the Raders, but also by Foster and Pelham in their capacities as chairman and vice chairman of UCDD's board. Insofar as Askins committed any of the acts with which she has been charged, her interests were highly adverse to UCDD's. She could have no reasonable expectation of confidentiality of statements made in front of members of its board of directors.

Askins also challenges the adequacy of UCDD's waiver of its attorney-client privilege

---

[2] The letter from Danny Rader does nothing to complicate the court's analysis. Askins is correct that, at least at times, the "you" in the letter appears clearly to refer to her. (E.g., Docket No. 150-2, p. 5.) Such use of the second person, however, is hardly surprising, given that Askins was an identified recipient of the letter. What matters is that both the content and context of the letter are consistent with the Rader Law Firm's communicating with her in her capacity as its client's executive director.

through Farley. Askins takes issue with the fact that Farley's waiver was not in writing, was not approved by UCDD's board, and was not preceded by a more detailed discussion of the waiver sought. The Government contends that Farley's waiver was valid, and that, in any event, Askins does not have standing to assert UCDD's privilege. *See In re Grand Jury Proceedings*, 469 F.3d 24, 26 (1st Cir. 2006) (holding that executive, intervening only in his personal capacity, lacked standing to assert the corporation's privilege). Both of the Government's arguments are well-taken. "[W]hen control of a corporation passes to new management, the authority to assert . . . the corporation's attorney-client privilege passes as well." *CFTC v. Weintraub*, 471 U.S. 343, 349 (1985). UCDD's attorney-client privilege is no longer Askins' to assert. Moreover, even if Askins had standing to assert UCDD's rights, she has not established that the alleged defects she identifies would render the waiver invalid.

## **CONCLUSION**

For the reasons discussed herein, the Motion to Dismiss Indictment and Disqualify Counsel by the defendant (Docket No. 150) will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge